675 F.2d 633
 The TRAVELERS INSURANCE CO., Plaintiff,
v.
The FIRST NATIONAL BANK OF SHREVEPORT, Defendant-Appellee
Cross-Appellant,
v.
Arnold KILPATRICK and Harper Terrill, as co-executors of the
estate of Mrs. Katherine Kilpatrick,
Defendants-Appellants Cross-Appellees.
 No. 80-3508.
 United States Court of Appeals,
Fifth Circuit.
 April 28, 1982.
 
 D. G. Brunson, William H. Baker, Jonesboro, La., Frederic C. Amman, III, William D. Brown, Monroe, La., for defendants-appellants, cross-appellees.
 Fred H. Sutherland, H. F. Sockrider, Jr., Shreveport, La., for defendant-appellee, cross-appellant.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before BROWN, COLEMAN and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 What began simply enough as a diversity-based Rule 22 interpleader to determine the ownership of the proceeds of a single life insurance policy, eventually burgeoned into a luxuriant complex of disputes between nondiverse claimants to the fund involving more than twenty life insurance policies, a power of attorney, and a will. Applying the standards for ancillary jurisdiction enunciated by the Supreme Court in Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), we conclude that none of the cross-claims raised between the original interpleader claimants was within the district court's ancillary jurisdiction. Pruning these, we vacate so much of the judgment below as relates to those claims. We affirm the district court's judgment on the claims involved in the original interpleader.
 
 
 2
 * Willard Kilpatrick, who lived in the town of Jonesboro, Louisiana, was a businessman and cattle farmer. With his wife, Katherine, he had accumulated a substantial fortune, most of which was held as community property. The Kilpatricks had no children.
 
 
 3
 Mrs. Kilpatrick had been ill for some time when, in 1972, Kilpatrick executed a will leaving the bulk of his estate in trust for his wife. The will named the First National Bank of Shreveport ("bank") both executor and testamentary trustee. Later that year, Kilpatrick executed an inter vivos life insurance trust. It too was for the benefit of his wife and named the bank trustee. To provide the trust corpus, Kilpatrick designated the trustee-bank beneficiary of nineteen life insurance policies having a total face value of approximately $450,000.[1]
 
 
 4
 In 1976, after lengthy conferences with counsel and representatives of the bank, Kilpatrick executed a new will ("1976 will"). This will again named the bank executor, and provided that: (1) his wife would receive his interest in their residence and certain personal items; (2) thirteen separate churches, in designated portions, would receive a cash bequest equal to ten percent of the gross estate; (3) his stock in Kilpatrick Ford, Inc., a closely held automobile sales agency, would be offered for sale at book value to the manager of that business if that person were still so employed at the time of decedent's death; and (4) the remainder of his estate would go to the bank as trustee of a testamentary educational foundation. Mrs. Kilpatrick also executed a will in 1976 which was, except for the provision concerning the Kilpatrick Ford stock, a counterpart of her husband's. Fearing small town rumors, the Kilpatricks conducted these transactions in Shreveport rather than in their hometown to insure secrecy. They stated to bank officials that they had already been generous to their relatives and felt no obligation to provide further for them.
 
 
 5
 In late 1976, soon after the execution of these wills, Kilpatrick fell seriously ill and was hospitalized, first in Jonesboro and then in Houston. There he was diagnosed as having terminal lung cancer with probable brain metastasis, and given two to three months to live. Kilpatrick returned from Houston to his home on December 16, 1976.
 
 
 6
 The next day, Kilpatrick signed a power of attorney appointing his brother, Arnold Kilpatrick, his agent. Pursuant to this power, Arnold Kilpatrick sold all of Kilpatrick's stock in the Ford agency to another automobile dealership, and, among other things, some of the Kilpatricks' real estate.[2]
 
 
 7
 By January 8, 1977, Kilpatrick's condition had so worsened that, even with his around-the-clock sitters, he could no longer remain at home. He was therefore rehospitalized, at the Jackson Parish Hospital, where he remained until his death some four weeks later.
 
 
 8
 Approximately one week after his readmittance to the hospital, Kilpatrick allegedly executed another will ("1977 will"), dated January 16, 1977, and signed with an "X" mark. This will purported to revoke his 1976 will, executed only four months previously, and to leave his entire estate to his wife. Mrs. Kilpatrick also allegedly executed another will that day, even though she too was in ill health. Her new will also revoked her earlier will and left her entire estate one-half to her heirs, and one-half to her husband's. Both of these wills named Kilpatrick's brother, Arnold, and Mrs. Kilpatrick's brother, Harper Terrill, as co-executors.
 
 
 9
 Four days later, on January 20, 1977, Kilpatrick allegedly signed additional documents, again by "X" mark, purporting to change the beneficiary of his life insurance from the bank, as trustee under the 1972 inter vivos trust, to Mrs. Kilpatrick. On February 6, 1977, approximately two-and-a-half weeks after the alleged execution of these last documents, Kilpatrick died.
 
 
 10
 Two days after Kilpatrick's death, Arnold Kilpatrick and Terrill presented Kilpatrick's 1977 will to the appropriate Louisiana state court for probate, and had themselves appointed ex parte as co-executors of his estate. Approximately three months later, the bank filed a petition in that court to annul the 1977 will, primarily on the ground that Kilpatrick lacked testamentary capacity when he executed it, and to have Kilpatrick's 1976 will admitted to probate instead. That action is still pending in the Louisiana courts.
 
 
 11
 Meanwhile, on July 26, 1978, Travelers Insurance Company, one of Kilpatrick's life insurers, deposited the $67,500 provided by its policy into the registry of the federal district court below and commenced this interpleader action pursuant to Rule 22, Fed.R.Civ.P. 22,[3] alleging that it was uncertain who was entitled to the proceeds. It named Mrs. Kilpatrick and the bank as the competing claimants. Mrs. Kilpatrick claimed the proceeds under one of the January 20, 1977, change of beneficiary forms allegedly executed by her husband. The bank, denying the validity of that instrument, again primarily on the ground that Kilpatrick lacked the mental capacity necessary to execute it, claimed under the beneficiary designation made by Kilpatrick in 1972 pursuant to the establishment that year of the inter vivos life insurance trust. In due course, Travelers was dismissed from the action and discharged from any further liability to the defendants-claimants on its policy.
 
 
 12
 On March 15, 1979, while both the state court action to annul Kilpatrick's 1977 will and this interpleader were still pending, Mrs. Kilpatrick died. Shortly afterward, as they had done upon Mr. Kilpatrick's death, Arnold Kilpatrick and Terrill opened Mrs. Kilpatrick's succession in state court by presenting her 1977 will for probate and were appointed ex parte co-executors of her estate. Thereafter, on August 27, 1979, in their capacities as her co-executors, they were substituted for Mrs. Kilpatrick as defendants-claimants in this interpleader.
 
 
 13
 The bank countered by submitting a "Supplemental and Amended Pleading" ("supplemental pleading"), which attempted to assert against the now-present co-executors certain cross-claims pursuant to Rule 13(g) of the Federal Rules of Civil Procedure.[4] The bank sought, inter alia, a decree that "from and after December 15, 1976, until and through February 6, 1977, Mr. Kilpatrick lacked the mental and physical capacity legally required to execute any legally binding documents including but not limited to the January 20, 1977, purported Change of Beneficiary Form at issue herein," i.e., the one relating to the Travelers policy. Such a decree, of course, would invalidate (at least as between the bank and Mrs. Kilpatrick's executors[5]) not only the Travelers change, but also all the other change of beneficiary forms allegedly executed on January 20, 1977, the December 17, 1976, power of attorney, and Kilpatrick's 1977 will. The district court immediately allowed the bank to file the supplemental pleading.
 
 
 14
 Arnold Kilpatrick and Terrill subsequently filed a number of motions seeking relief from the allowance of this pleading. They rather inartfully argued that the claims it raised against them were improper under Rule 13(g) because they were "immaterial to ... the question before (the) Court," i.e., the ownership of the proceeds from the Travelers policy. And, specifically with regard to so much of the sought decree as would invalidate Kilpatrick's 1977 will, the co-executors additionally contended that the seeking of such relief was barred from federal courts as falling within the "probate exception" to federal jurisdiction.[6]
 
 
 15
 After receiving briefs and hearing oral argument on these motions, the district court ruled that the "validity of the (1977) will is not within the jurisdiction of this court; therefore motions to dismiss that issue (are) granted. Secondly, the validity of the power of attorney is not within the probate exception; therefore it is properly before the court."[7] Although the court did not expressly say so, it apparently assumed that the claims asserted by the bank against the co-executors were otherwise valid cross-claims under Rule 13(g).
 
 
 16
 After a seven-day trial to the court, the district judge, in findings of fact and conclusions of law orally delivered from the bench, found that from December 15, 1976, until his death, "there was a permanent mental incapacity in Willard Kilpatrick." The court held that, under the applicable provisions of the Louisiana Civil Code,[8] all the change of beneficiary forms and the power of attorney were invalid.
 
 
 17
 The co-executors appeal, renewing their argument that none of the cross-claims asserted against them by the bank's supplemental pleading was proper under Rule 13(g). They also contend that, if the claims were within the district court's jurisdiction, the court applied the wrong article of the Louisiana Civil Code to them and otherwise erred on the merits. The bank cross-appeals from the district court's interlocutory ruling that its claim with regard to the asserted invalidity of Kilpatrick's 1977 will was within the "probate exception" to federal jurisdiction.
 
 II
 
 18
 Our first task is to determine whether the district court had jurisdiction over the cross-claims asserted against the co-executors by the bank in its supplemental pleading.[9] To recall, that pleading sought a declaration that would have, in effect, invalidated: (1) all the changes of beneficiary (allegedly) executed by Kilpatrick on January 20, 1977, not only the Travelers form; (2) Kilpatrick's December 17, 1976, power of attorney, bestowed upon his brother, Arnold; and (3) Kilpatrick's January 16, 1977, will. We conclude that the district court did not have jurisdiction over any of these purported cross-claims because, first, as claims between citizens of the same state and based on state law, they were not supported by any independent basis of federal jurisdiction, and, second, because they were not "logically dependent" upon the original claim over which the district court did have jurisdiction and thus not proper cross-claims under Rule 13(g), they were not supported by the doctrine of ancillary jurisdiction.
 
 
 19
 It is settled, of course, that ancillary jurisdiction does extend to cross-claims properly asserted under Rule 13(g), including those filed between competing claimants in a Rule 22 interpleader. See, e.g., Davis v. Prudential Insurance Co., 331 F.2d 346, 348 n.2 (5th Cir. 1964); see also 3A Moore, supra note 4, P 22.15, at 22-151; 7 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1715, at 449-50 (1972). As we recently cautioned, however,
 
 
 20
 the mere filing of a claim denominated as a cross claim does not purport to settle the issue whether the claim is actually ancillary. Such a consequence would be untenable inasmuch as the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction. Fed.R.Civ.P. 82. A claim which satisfies the "transaction or occurrence" test of Rule 13(g) necessarily must be closely related to the original action. Thus, a proper cross claim satisfies the requirements of ancillary jurisdiction. It matters not if we ask whether this claim is a proper cross claim under Rule 13(g) or whether this claim is supported by ancillary jurisdiction. The analysis is substantially the same and our result would be the same.
 
 
 21
 Amco Construction Co. v. Mississippi State Building Commission, 602 F.2d 730, 732-33 (5th Cir. 1979) (citations omitted) (attempted cross-claim between two nondiverse third-party defendants).
 
 
 22
 Apparently recognizing this, the bank argues that its cross-claims against the co-executors were within the district court's ancillary jurisdiction (and, therefore, valid under Rule 13(g)) by relying on our statement in Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co., 426 F.2d 709 (5th Cir. 1974), that "a claim is ancillary when it bears a logical relationship to the aggregate core of operative facts which constitutes the main claim over which the court has an independent basis of federal jurisdiction," 426 F.2d at 714. According to the bank, its cross-claims met that test because they "nearly all" depended upon the same "single operative fact," Kilpatrick's "mental capacity ... during the period in question," that was determinative of the original action. Although this argument might seem plausible at first glance, it cannot be sustained in light of the Supreme Court's decision in Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The key is the requirement that, for a nondiverse claim to be considered ancillary to a diverse one, it must not only arise from the same "core of operative facts" as does the diverse claim, but it must also bear a "logical relationship" to that claim.
 
 
 23
 In Owen Equipment, the Supreme Court addressed the question, "In an action in which federal jurisdiction is based on diversity of citizenship, may the plaintiff assert a claim against a third-party defendant when there is no independent basis for federal jurisdiction over that claim?" 437 U.S. at 367, 98 S.Ct. at 2399, 57 L.Ed.2d at 278. Answering that question in the negative, the Court began by assuming that the plaintiff's claims against the nondiverse third-party defendant and her claims against the original, diverse defendant arose from a "common nucleus of operative fact," but held that that was sufficient only to bring the nondiverse claim within the "constitutional limits of federal judicial power." Id., 437 U.S. at 371, 98 S.Ct. at 2401, 57 L.Ed.2d at 280 (emphasis added), citing UMW v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 227 (1966). It did not necessarily follow, the Court said, that the nondiverse claim was within the statutory grant of federal jurisdiction made by 28 U.S.C. § 1332, as expanded by the concept of ancillary jurisdiction.[10] In making that determination, the "context in which the non(diverse) claim is asserted is crucial." Id., 437 U.S. at 376, 98 S.Ct. at 2403-04, 57 L.Ed.2d at 283-84.
 
 
 24
 Examining that "context," the Court noted one basic difference between the plaintiff's attempted claim against the nondiverse third-party defendant in its case and those nondiverse claims routinely held to be within a federal court's ancillary jurisdiction. That crucial difference was that the plaintiff's proposed claim against the nondiverse third-party defendant
 
 
 25
 was simply not ancillary to the (main claim against the diverse defendant) in the same sense that, for example, the impleader by a defendant of a third-party defendant always is. A third-party complaint depends at least in part upon the resolution of the primary lawsuit.... Its relation to the original complaint is thus not mere factual similarity but logical dependence.
 
 
 26
 Id., 437 U.S. at 376, 98 S.Ct. at 2404, 57 L.Ed.2d at 284 (emphasis added).[11] The Court expanded on this point in its conclusion:
 
 
 27
 It is not unreasonable to assume that, in generally requiring complete diversity (under 28 U.S.C. § 1332), Congress did not intend to confine the jurisdiction of federal courts so inflexibly that they are unable to protect legal rights or effectively to resolve an entire, logically entwined lawsuit. Those practical needs are the basis of the doctrine of ancillary jurisdiction. But neither the convenience of litigants nor considerations of judicial economy can (alone) suffice to justify extension of (that) doctrine ... to a plaintiff's cause of action against a citizen of the same state in a diversity case.... "The policy of (28 U.S.C. § 1332) calls for its strict construction."
 
 
 28
 Id., 437 U.S. at 377, 98 S.Ct. at 2404, 57 L.Ed.2d at 284 (emphasis added; citations omitted).
 
 
 29
 We have recognized the controlling significance of Owen Equipment 's reasoning in the context of a nondiverse cross-claim. In Amco Construction, supra, a plaintiff subcontractor sued its contractor's diverse surety on a performance and payment bond. The defendant surety then impleaded the contractor and the owner as third-party defendants. The contractor, in turn, attempted to assert a cross-claim against the owner based on alleged breaches of their original contract. No diversity of citizenship existed between these last two parties. In holding that this attempted cross-claim was not within the district court's ancillary jurisdiction, we stated:
 
 
 30
 It would not have been necessary to decide the proposed cross claim to protect the integrity of the original claim or to insure that the disposition of the original claim would not have been frustrated. (The) proposed cross claim stands apart; it is a cause of action wholly independent and separate.
 
 
 31
 Amco Construction, supra, 602 F.2d at 733.
 
 
 32
 Applying the Owen Equipment and Amco Construction rationale to the attempted cross-claims here, we conclude that their relation to the original claim was not one of "logical dependence," but only one of "mere factual similarity;" therefore, they were not within the district court's ancillary jurisdiction. Owen Equipment, supra, 437 U.S. at 376, 98 S.Ct. at 2404, 57 L.Ed.2d at 284.
 
 
 33
 Looking first at the attempted cross-claims relating to the change of beneficiary forms other than Travelers', it might initially appear that they were all "closely" related to the original claim, as indeed in one sense they undoubtedly were. They were all allegedly executed on the same day, under the same conditions, and by the same person. This does not alter the fact, however, that all these claims did not together constitute an "entire, logically entwined lawsuit,"[12] but were instead only a series of "independent and separate"[13] claims, albeit ones involving the same central factual inquiry. To repeat, however, "neither the convenience of litigants nor considerations of judicial economy can suffice to justify extension of the doctrine of ancillary jurisdiction ...." Owen Equipment, supra, 437 U.S. at 377, 98 S.Ct. at 2404, 57 L.Ed.2d at 284. These same observations can, of course, be made with even greater force with regard to the bank's other attempted cross-claims, i.e., those relating to Kilpatrick's December 16, 1976, power of attorney and his January 16, 1977 will. As before, it simply cannot be said that these claims were "logically dependent" on the resolution of the question as to who was entitled to the proceeds from the Travelers policy.
 
 
 34
 Moreover, the raison d'etre of ancillary jurisdiction is to allow the district court to effect "complete justice between the parties with respect to the original action." 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1433, at 178 (1971). Here, however, unlike the situation in Owen Equipment, the allowance of the bank's cross-claims, far from accomplishing this desirable end, would instead potentially affect the legal positions of a number of persons who are not party to this suit. For example, the record discloses that Kilpatrick's inter vivos trust contained twenty-one separate policies of insurance issued by thirteen separate insurance companies, yet only Travelers would be bound by any judgment that could have been issued by the court below. Similarly, the power of attorney was used to effect the sale of a number of Kilpatrick's assets, but the purchasers of those assets were likewise absent from this suit. Thus, we think the reasons as strong, if not stronger, than those in Owen Equipment for holding these claims not within the district court's ancillary jurisdiction, despite the inapplicability of one of the factors relied upon by the Court for its holding in that case.[14]
 
 III
 
 35
 We now turn to the district court's decision on the merits of the original and sole remaining issue, the rightful owner of the Travelers proceeds. Mrs. Kilpatrick's executors contend that the court below erred when it applied article 1788 of the Louisiana Civil Code to the facts, instead of applying article 1789. Article 1788[15] deals with permanent insanity, while article 1789[16] deals with transitory mental incapacity. If Kilpatrick had been only temporarily deranged, the burden would have been placed upon the bank to prove not only that he was mentally incapacitated at the time he made the contract, but also that the party who dealt with him had knowledge of the condition or that the incapacity was generally known. See First National Bank of Shreveport v. Williams, 346 So.2d 257, 261 (La.App.1977); Smith v. Blum, 143 So.2d 419, 422 (La.App.1962).
 
 
 36
 The argument falls with its premise, for article 1789 and the rules concerning transitory disturbance can by definition apply only when the derangement is temporary. Whether a mental condition is temporary or permanent is itself a factual question. The trial judge found that from December 15, 1976, until his death in February 1977, Kilpatrick had a permanent mental incapacity; that he died within thirty days of the execution of the change of beneficiary; and that the bank had proved by clear and convincing evidence that his incapacity was generally known. The court concluded that Kilpatrick was incapable on January 20, 1977, of giving his consent "which none but the persons in possession of their mental faculties can give." We find no error, factual, see Fed.R.Civ.P. 52(a), or legal, in these conclusions, and therefore affirm the district court's judgment insofar as it relates to the Travelers change of beneficiary form.
 
 
 37
 In sum, we AFFIRM the district court's acceptance of jurisdiction over the original interpleader; we hold that the district court did not have jurisdiction over the claims raised in the bank's supplemental pleading, and therefore VACATE that part of the judgment below relating to those claims and DISMISS those claims from the case; and we AFFIRM the district court's judgment on the merits insofar as it pertains to the original interpleader action.
 
 JOHN R. BROWN, Circuit Judge, concurring:
 
 38
 I concur fully in Judge Rubin's opinion. I add this only to warn the appellants and all claiming by, through or under any one or more or all of them that this may well be a hollow victory. Without a doubt the findings and judgment of the District Court which we affirm will present a classic case of res judicata, or at worst, collateral estoppel. Only one significant factual issue exists-the permanent lack of mental capacity of Willard Kilpatrick between December 15, 1976 and the date of his death in February, 1977. This was the issue posed as between the bank, as executor of Willard Kilpatrick's 1976 will and as trustee of the inter vivos life insurance trust of 1972 (with amendment), on the one hand, and the only real antagonist, his wife Katherine Kilpatrick, and upon her death, her executors Arnold Kilpatrick and Harper Terrill and as executors under Willard Kilpatrick's "X" signed will of January, 1977.
 
 
 39
 The real parties were identical. On the one hand was the bank. On the other were Arnold Kilpatrick and Harper Terrill as claimed executors under Willard Kilpatrick's "new" will signed by an "X" (and the same persons as executors of the estate of the wife Katherine Kilpatrick). The issue was absolutely identical: between December 15, 1976 and his death February 6, 1977, was Willard permanently, mentally incapable? Moreover, this was not merely an essential issue, it was the only issue.
 
 
 40
 The judge answered this query with a resounding negative.[1] And agreeing with the District Judge's choosing § 1788, Louisiana Civil Code, instead of § 1789, our approval of the District Judge's findings is emphatic:
 
 
 41
 Whether a mental condition is temporary or permanent is itself a factual question. The trial judge found that from December 15, 1976, until his death in February 1977, Kilpatrick had a permanent mental incapacity; that he died within thirty days.... The court concluded that Kilpatrick was incapable on January 20, 1977, of giving his consent "which none but persons in possession of their mental faculties can give." We find no error, factual, ... or legal, in these conclusions, and therefore affirm the district court's judgment insofar as it relates to the Travelers change of beneficiary form.
 
 
 42
 Panel Opinion at 18.
 
 
 43
 With respect to the other 20 insurance policies, the contest is still between the bank, as trustee, and the wife or her executors, or both. In this controversy the several insurance companies, like Travelers in the initial case, were simply innocent stakeholders.
 
 
 44
 With respect to the power of attorney, the controversy is still between the bank, as trustee under Willard Kilpatrick's 1976 will, challenging the validity of the power of attorney, on the one hand, and on the other hand, Arnold Kilpatrick, the attorney in fact named who undertook to and did act pursuant to the power of attorney.[2]
 
 
 45
 Louisiana recognizes the statutory res judicata embodied in Article 2286, Louisiana Civil Code. Granted that Welch v. Crown Zellerbach Corp., 359 So.2d 154 (La.1978), seems to reject Louisiana's long-time embrace of the common law concept of collateral estoppel of issue preclusion, the criticisms leveled at that decision by acknowledged civilian experts, Litigation Preclusion in Louisiana: Welch v. Crown Zellerbach Corporation and the Death of Collateral Estoppel, 53 Tul.L.Rev. 875 (1979),[3] and the action of the Supreme Court of Louisiana in R. G. Claitor's Realty v. Juban, 391 So.2d 394 (La.1980),[4] raises in me a sufficient hope that the Supreme Court of Louisiana within, or without, the Code Civil will hold the feet of all of these parties and persons to the fire and to these findings and make unnecessary, as between them, re-examination or relitigation of this central issue.
 
 
 
 [1]
 In 1974 Kilpatrick added two more policies, having a face value of $100,000, to the trust, thereby increasing the amount to be managed by the bank to approximately $550,000
 
 
 [2]
 In their 1976 wills, the Kilpatricks had each expressed the opinion that the retention of their real estate by the bank as trustee for the testamentary educational foundation would be "in the best interests ... of the Beneficiaries of the Trust," and "recommended" that the bank continue "to hold (the real estate) unless some compelling reason should arise ... for (it) to be sold."
 
 
 [3]
 Rule 22 provides in relevant part:
 (1) Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability ....
 Fed.R.Civ.P. 22.
 
 
 [4]
 Rule 13(g) states in relevant part:
 A pleading may state as a cross-claim any claim by one party against a coparty arising out of the transaction or occurrence that is the subject matter ... of the original action ....
 Fed.R.Civ.P. 13(g).
 Because the competing claimants in an interpleader action are nominally all defendants, cf. 3A J. Moore, Federal Practice P 22.04(2.-1), at 22-17 (2d ed. 1979) (discussing diversity jurisdiction in Rule 22 interpleaders) (hereinafter cited as Moore ), claims asserted by one interpleader claimant against another are considered cross-claims.
 
 
 [5]
 See text at note 14 infra
 
 
 [6]
 Because we dispose of these claims on other grounds, see Part II infra, we are spared the task of deciding this difficult issue. Professor Wright states that the "probate exception" turns on "unclear distinctions of the utmost subtlety." C. Wright, Handbook of the Law of Federal Courts 98 (3d ed. 1976); accord, 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3610, at 678 (1975). To illustrate, the Supreme Court has flatly stated that, "in proceedings purely of a probate character, there (is) no jurisdiction in the Federal courts." Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 45, 30 S.Ct. 10, 13, 54 L.Ed. 80, 85 (1909). Yet, it has also ruled that a suit to annul a will can be brought in federal court if, "by the law obtaining in the state, customary or statutory," such a suit is considered inter partes and not in rem, and the parties are of diverse citizenship. Gaines v. Fuentes, 92 U.S. 10, 20-21, 23 L.Ed. 524, 528 (1875); cf. Ellis v. Davis, 109 U.S. 485, 498-503, 3 S.Ct. 327, 335-38, 27 L.Ed. 1006, 1010-12 (1883) (discussing what determines whether a suit to annul a will in Louisiana is considered inter partes or in rem ). For general discussions of the "probate exception," see P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1183-89 (2d ed. 1973); Wright, supra this note, 98-99; Wright, Miller & Cooper, supra this note, § 3610; Vestal & Foster, Implied Limitations on the Diversity Jurisdiction of Federal Courts, 41 Minn.L.Rev. 1, 13-23 (1956); Note, Federal Court Probate Proceedings, 45 Ind.L.J. 387 (1970); Note, Federal Jurisdiction and Practice: Probate Matters, 15 Okla.L.Rev. 462 (1962); Note, Federal Jurisdiction in Matters Relating to Probate and Administration, 43 Harv.L.Rev. 462 (1930)
 
 
 [7]
 Minutes of Court, March 14, 1980
 
 
 [8]
 See generally text and notes at notes 15-16 infra
 
 
 [9]
 It is not disputed that the district court had jurisdiction over the original Rule 22 interpleader filed by Travelers. The basis for such jurisdiction was 28 U.S.C. § 1332, which provides for the bringing of civil actions in federal court when the matter in controversy exceeds the sum of $10,000 and is "between citizens of different States." Id. at § 1332(a)(1). In such an action, it has long been held that the diversity between the parties must be "complete," in the sense that each plaintiff must be a citizen of a state different from that of each defendant. Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Reasoning from this, "federal courts have been uniform in holding that jurisdiction exists (over Rule 22 interpleaders brought under 28 U.S.C. § 1332) when the citizenship of the plaintiff (stakeholder) is diverse from that of all defendants (claimants), despite the fact that as among themselves the claimants are not citizens of different states." 3A Moore, supra note 4, P 22.04(2.-1), at 22-17; see, e.g., Haynes v. Felder, 239 F.2d 868, 870-71 (5th Cir. 1957). Therefore, as Travelers, the plaintiff-stakeholder, was a Connecticut corporation, while the bank (which, as a national banking association, is treated as a citizen of the state within which it is located, 28 U.S.C. § 1348) and Mrs. Kilpatrick (and later, her co-executors), the defendants-claimants, were all citizens of Louisiana, Travelers's Rule 22 interpleader was properly brought in federal district court under 28 U.S.C. § 1332
 
 
 [10]
 "Constitutional power is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over a particular controversy. For the jurisdiction of the federal courts is limited ... also by Acts of Congress." Id., 437 U.S. at 372, 98 S.Ct. at 2401, 57 L.Ed.2d at 280
 
 
 [11]
 The Court noted as a second difference that it was the plaintiff in its case who was attempting to assert the nondiverse claim; "by contrast, ancillary jurisdiction typically involves claims by a defending party haled into court against his will...." Id., 437 U.S. at 376, 98 S.Ct. at 2404, 57 L.Ed.2d at 284. Obviously, this point is not available to support our holding because the bank was not the plaintiff, Travelers was. We do not think that this difference between Owen Equipment and the present case is sufficient to justify a different result, however, especially when certain additional factors, not present in that case, are considered. See text at note 14 infra
 
 
 [12]
 Owen Equipment, supra, 437 U.S. at 377, 98 S.Ct. at 2404, 57 L.Ed.2d at 284 (emphasis added)
 
 
 [13]
 Amco Construction, supra, 602 F.2d at 733
 
 
 [14]
 See note 11 supra
 
 
 [15]
 This article provides in relevant part:
 Art. 1788. The contract, entered into by a person of insane mind, is void as to him for the want of that consent, which none but persons in possession of their mental faculties can give....
 
 
 [5]
 That if the party die within thirty days after making the act or contract, the insanity may be shown by evidence, without having applied for the interdiction; but if more than that time elapse, the insanity can not be shown to invalidate the act or contract, unless the interdiction shall have been applied for, except in the case provided for in the following rule
 
 
 [9]
 That evidence of general and habitual insanity, in order to avoid a contract, may be rebutted by showing that the contract or act was made during a lucid interval; but where general insanity, even with some intervals, is shown, the burden of showing that the particular act in dispute was made during such an interval, is thrown on the party who supports the validity of the act or contract
 La.Civ.Code Ann. art. 1788 (West 1952).
 
 
 [16]
 This article provides:
 A temporary derangement of intellect, whether arising from disease, accident or other cause, also creates an incapacity pending its duration, provided the situation of the party and his incapacity were apparent.
 La.Civ.Code Ann. art. 1789 (West 1952).
 
 
 [1]
 "(T)he district judge ... found that from December 15, 1976, until his death, 'there was a permanent mental incapacity in Willard Kilpatrick.' The court held that, under the applicable provisions of the Louisiana Civil Code, all the change of beneficiary forms and the power of attorney were invalid."
 Panel Opinion at 8-9 (footnote omitted).
 
 
 [2]
 We need not concern ourselves here as to the position of any bona fide innocent purchasers for value, if any, who may have consummated purchases from the attorney in fact acting under the power of attorney. This has nothing to do with the binding preclusive effect as between the bank and the so called attorney in fact
 
 
 [3]
 In the current academic atmosphere, the decision seems likely to be celebrated for its fidelity to the Civil Code and its contribution to what has been called the "civilian renaissance" in Louisiana. Any such celebration, however, should be tempered by an awareness of the fundamental danger inherent in that trend and exemplified by this decision: there is a point beyond which a valid interest in preserving unique tradition lapses into chauvinism and engenders decisions which, like Welch, are little more than kneejerk reflexes in a civilian mode
 To be sure, the Welch decision appears to stand squarely within the recent jurisprudential trend toward stricter application of the Civil Code-a trend widely celebrated by Louisiana commentators. But that trend can be extended with impunity only so far. To ignore the mixed parentage of our legal system within the context of substantive state law may constitute at worst a kind of wishful thinking more quaint than damaging; but to do so in the context of those procedural rules which regulate the system as a mechanism is to confuse fidelity to the Civil Code with a literalism that borders on the mechanistic.
 Litigation Preclusion ..., supra, 53 Tul.L.Rev. at 875, 906 (footnotes omitted).
 
 
 [4]
 See L'Enfant, Developments in the Law, 1980-1981: Louisiana Civil Procedure, 42 La.L.Rev. 676, 691-92 (1982). With respect to the dissent by Justice Dennis, the article states:
 Only future cases will make it clear whether Justice Dennis is correct in asserting that Juban marks a departure from the court's position with respect to res judicata. If Juban is read as saying that res judicata barred the second suit even though a new theory of recovery was asserted, then Louisiana would be moving closer to the common law principle of res judicata which bars relitigation of the same claim even if the second suit is based on a different theory of recovery.
 Id. at 692.